1

2

3

4

5

6

7

8

9

10

11

12

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

ANDREA A.,

                 Plaintiff,

    v.

COMMISSIONER OF SOCIAL SECURITY,

                 Defendant.

CASE NO. C19-1706-BAT

**ORDER REVERSING AND REMANDING FOR FURTHER ADMINISTRATIVE PROCEEDINGS**

13

14

15

16

17

18

      Plaintiff appeals the denial of her applications for Supplemental Security Income and Disability Insurance Benefits. She contends the ALJ erred by (1) finding that plaintiff's hand limitations improved to such a degree that she can work; and (2) failing to properly consider ADHD and its effects on her ability to maintain pace and concentration. Dkt. 14. As discussed below, the Court **REVERSES** the Commissioner's final decision and **REMANDS** the matter for further administrative proceedings under sentence four of 42 U.S.C. § 405(g).

19

**BACKGROUND**

20

21

22

23

      Plaintiff is currently 38 years old, has a GED, and has worked as a cashier checker, fast-food worker, detailer, material handler, and janitor. Tr. 148–157; *see* Tr. 24. In 2010, she applied for benefits, alleging disability as of June 6, 2008. Tr. 539, 543. In 2012, plaintiff testified without representation at an ALJ hearing. Tr. 113–41. In the 2012 first decision, the ALJ found

1  that she was not disabled. Tr. 245–57. In 2013, the Appeals Council reversed and remanded for

2  further administrative proceedings because the ALJ had made a contradictory determination that

3  bipolar disorder constituted both a severe and a non-severe impairment at step two of the

4  sequential evaluation. Tr. 265.

5      In 2014, plaintiff testified at a hearing before the same ALJ, this time represented by

6  counsel. Tr. 142–84. In the 2014 second decision, the ALJ issued a partially favorable decision,

7  finding plaintiff disabled from June 6, 2008 to July 14, 2011, but not thereafter because recovery

8  from successful carpal tunnel release surgery on both her hands had resulted in medical

9  improvement.  Tr. 273–88. In 2016, the Appeals Council reversed and remanded for further

10 proceedings before a different ALJ because the question of medical improvement since mid-July

11 2011 had not been adequately evaluated. Tr. 299–301. The Appeals Council noted that plaintiff

12 underwent left carpal tunnel release surgery on July 28, 2011, such that it was unclear how

13 medical improvement was found as of July 15, 2011; the decision did not address more recent

14 evidence pertaining to complaints of myoclonic jerks and diabetic neuropathy affecting the

15 hands; and the ALJ's decision did not address plaintiff's ability to ambulate despite a lumbar

16 spine impairment and diabetic neuropathy. Tr. 299. The Appeals Council instructed the new ALJ

17 to (1) obtain additional evidence concerning plaintiff's physical and mental impairments;

18 (2) further evaluate plaintiff's mental impairments; (3) further evaluate plaintiff's subjective

19 complaints; (4) give further consideration to plaintiff's residual functional capacity ("RFC")

20 during the entire period at issue; (5) obtain, if necessary, evidence from a medical expert ("ME")

21 to clarify whether plaintiff needed an assistive device for ambulation or whether her physical or

22 mental impairments met the requirement of a listed impairment; and (6) if warranted, obtain

23 evidence from a vocational expert ("VE"). Tr. 300–01.

After a 2017 hearing, in a 2018 third decision, the ALJ issued a partially favorable decision. At step two of the sequential evaluation, the ALJ determined that plaintiff has the severe impairments of obesity; bilateral carpal tunnel syndrome, status post bilateral surgery; diabetes with neuropathy; sleep apnea; lumbar spine condition; polycystic ovary syndrome; affective disorders variously diagnosed as depression, dysthymia, and bipolar; anxiety disorder; PTSD; intermittent explosive disorder; and personality disorder. Tr. 19. The ALJ determined that from June 6, 2008 to September 11, 2011, plaintiff had the RFC to perform sedentary work with additional physical and mental limitations, including that she could *occasionally* handle, figure, and feel. Tr. 21. That limitation to occasionally handle, figure, and feel led to a finding of disability from June 6, 2008 to September 11, 2011 because plaintiff could neither return to past relevant work nor perform a job that exists in significant numbers in the national economy. Tr. 24–25. The ALJ determined, however, that beginning on September 12, 2011, plaintiff had medically improved such that she had the RFC bilaterally to *frequently* handle, finger, and feel. Tr. 29. The ALJ thus found her not disabled from that date onward because, though she could not perform past relevant work, plaintiff could perform other jobs that exist in significant numbers in the national economy such as final assembler, addresser, and microfilm document preparer. Tr. 38. The Appeals Council denied plaintiff's request for review such that the ALJ's 2018 decision is the Commissioner's final one. Tr. 2–5.

## DISCUSSION

Plaintiff contends that the ALJ erred by determining that she was capable of working due to medical improvement of her hands and by failing to consider how ADHD limited her ability to maintain pace and concentration. Although the Court rejects plaintiff's contention regarding ADHD, the Court finds that the ALJ harmfully erred by failing to evaluate the evidence that after

1    the resolution of limitations from carpal tunnel syndrome plaintiff continued to suffer numbness,

2    pain, and limitations in her hands due to diabetic neuropathy, myoclonic jerks, and de Quervain's

3    tenosynovitis. The Court reverses and remands for further administrative proceedings because

4    the ALJ's decision is unsupported by substantial evidence and the result of harmful legal error.

5    *Molina v. Astrue*, 674 F.3d 1104, 1110 (9th Cir. 2012).

6    **1. Manipulative Limitations of the Hands**

7    The ALJ determined that plaintiff's hand limitations ended on September 11, 2011, due

8    to successful recovery from carpal tunnel surgery. The ALJ did not, however, follow the Appeals

9    Council's instruction to evaluate the evidence that plaintiff's manipulative hand limitations

10   continued beyond the closed disability period for reasons other than carpal tunnel syndrome.

11   Tr. 300. This constituted harmful error because the difference between disability during the

12   closed period and non-disability thereafter hinges on whether plaintiff can *occasionally* or

13   *frequently* handle, finger, and feel.

14   The Appeals Council noted that although treating physician Gary Bergman, M.D., who

15   performed carpal tunnel release surgeries bilaterally, opined that plaintiff could return to usual

16   and customary work in mid-September 2011, "the [ALJ's] decision does not address more recent

17   evidence pertaining to complaints of myoclonic jerks and diabetic neuropathy affecting the

18   hands." Tr. 299–300. The Appeals Council therefore instructed the ALJ on remand to further

19   develop the record and evaluate plaintiff's manipulative limitations throughout the entire period

20   at issue, which included reevaluating plaintiff's subjective complaints. Tr. 300. The ALJ

21   provided six reasons for discounting plaintiff's testimony about her hand limitations after the

22   closed period of disability: (1) after December 2010 right carpal tunnel surgery, her right-hand

23   symptoms had resolved by February 2011, Tr. 1218, 1220–1222, and after July 2011 left carpal

1   tunnel surgery, her left-hand symptoms were already much improved by August 2011, Tr. 1201;

2   (2) on September 12, 2011, Dr. Bergman noted essentially normal examination findings

3   bilaterally and opined that plaintiff could advance to full activities as tolerated and return to her

4   usual and customary work, Tr. 1200; (3) plaintiff never returned to Dr. Bergman or any other

5   specialist with complaints about her hands; (4) plaintiff underwent an independent medical

6   examination in October 2011 for the Washington State Department of Labor and Industries in

7   which the examiners cleared plaintiff for a return to work and rated her upper extremities as only

8   2 percent impaired, Tr. 1191–99; (5) subsequent treatment notes showed only intermittent

9   complaints of hand/wrist problems in 2012 or after, *see, e.g.*, Tr. 1472–74, 1478; and

10  (6) objective findings showed normal strength and range of motion in the hands/wrists and,

11  unlike during the closed period of disability, there were no EMG studies indicating neurological

12  abnormalities of the hands, *see, e.g.*, Tr. 1383, 1484, 1491, 1567, 1675, 1808, 1815, 1824, 1894,

13  2087–88. Tr. 30. Viewed in isolation, these would be persuasive reasons to discount plaintiff's

14  symptoms of continued, manipulative hand limitations. They cannot, however, constitute clear

15  and convincing reasons to discount plaintiff's symptom testimony here because the ALJ declined

16  to acknowledge and evaluate significant record evidence suggesting that numbness and pain

17  unrelated to carpal tunnel syndrome led to manipulative hand limitations that continued past the

18  closed disability date. *See, e.g.*, *Ghanim v. Colvin*, 763 F.3d 1154, 1164 (9th Cir. 2014); *see also,*

19  *e.g.*, *Robinson v. Barnhart*, 366 F.3d 1078, 1083 (10th Cir. 2004) ("The ALJ is not entitled to

20  pick and choose from a medical opinion, using only those parts that are favorable to a finding of

21  nondisability."); *Switzer v. Heckler*, 742 F.2d 382, 385–86 (7th Cir. 1984) ("[T]he Secretary's

22  attempt to use only portions [of a report] favorable to her position, while ignoring other parts, is

23  improper.").

1    In 2017, plaintiff testified that post-carpal tunnel release surgery, she continued to have

2    sharp shooting pains, numbness, and cold and had difficulty with grabbing and with dropping

3    things. Tr. 229. Plaintiff stated that the surgeon had informed her that her post-operative hand

4    condition was already as good as it could get. Tr. 231. Plaintiff testified that the "glove" effect

5    from diabetes, i.e., the numbness she feels in her hands, rendered her unable to work in jobs such

6    as cashier because she would have difficulty handling money in that she had a hard time feeling

7    paper. Tr. 232. In 2014, plaintiff testified that although her carpal tunnel surgery "worked

8    wonderful" because her fingers "didn't hurt so bad," she continued to have constant numbness

9    and cold in the tips of her fingers that rendered her unable to put small parts together, tie objects,

10   or type on a keyboard. Tr. 158. When queried about whether her finger condition was related to

11   carpal tunnel syndrome, diabetes, or even her back injury, plaintiff responded: "I would say that

12   a tie between the neuropathy and my diabetes and the neuropathy I have I believe. It is not my

13   back." *Id.* In 2012, when she testified without the benefit of a representative, plaintiff noted that

14   she still had bilateral pain and numbness in her hands despite surgery to correct it. Tr. 123.

15   Plaintiff stated that her pain was aggravated by grabbing things, she had problems dropping

16   things, and symptoms could vary from being numb and tingly to aching. Tr. 124.

17       The ALJ did not adequately discuss or evaluate evidence that was consistent with

18   plaintiff's continued manipulative limitations stemming from conditions other than carpal tunnel

19   syndrome, most notably hand numbness based on the severe impairment of diabetic neuropathy.

20   Although on September 12, 2011, Dr. Bergman doubted that plaintiff would continue to

21   experience residual symptoms from the recent *left* carpal tunnel release surgery, he reported mild

22   post-operative pillar pain and residual hypesthesia of the *right* hand fourth and fifth fingers. Tr.

23   1200. Thereafter, the record contains numerous instances in which plaintiff complained about

1    hand numbness and pain that were unrelated to the successful carpal tunnel surgery. In May

2    2012, treating physician Janine Yeostros, M.D., noted that plaintiff had diabetes with neuropathy

3    and occasional numbness in both thumbs, referred to bilateral hand pain and paresthesia of the

4    upper extremities, and ordered x-rays of her hands. Tr. 1482–84. On referral from Dr. Yeostros

5    later in May 2012, neurologist Antoine Samman, M.D., noted that although the carpal tunnel

6    release surgery "seemed to have helped the numbness and tingling of the first 3 fingers . . . now

7    she has those symptoms in the fourth and fifth fingers." Tr. 1476. Dr. Samman further noted that

8    on a sensory exam plaintiff showed "a clear cut glove and stocking pattern of hypalgesia and

9    hypesthesia" and diagnosed sensory diabetic neuropathy. Tr. 1478. In June 2012, Dr. Yeostros

10   noted ongoing pain and numbness in the hands and feet and, while x-rays showed no acute

11   mechanical abnormalities, there was tenderness on palpation over the proximate thumbs. Tr.

12   1472–74. Dr. Yeostros diagnosed de Quervain's tenosynovitis and prescribed splints and

13   physical therapy, while also diagnosing diabetic neuropathy and increasing Gabapentin dosage to

14   treat painful numbness. Tr. 1474–75. In August 2012, Dr. Yeostros referred to plaintiff's

15   ongoing numbness and pain in her hands. Tr. 1463. In July 2013, Dr. Yeostros referred to

16   plaintiff's hand pain and use of a wrist splint. Tr. 1423. In August 2013, plaintiff sought

17   treatment from pain specialist Adam Balkany, M.D., primarily for chronic and worsening back

18   pain, but Dr. Balkany also noted diabetic neuropathy affecting both her hands and feet, including

19   "glove distribution neuropathy" of the bilateral upper extremities. Tr. 1671–72, 1675. In January

20   2014, plaintiff was seen by neurologist John R. Jefferson, M.D., for myoclonic jerks in addition

21   to painful sensory diabetic neuropathy, and Dr. Jefferson referred plaintiff for an

22   electrodiagnostic study to learn more about the etiology of her severe polyneuropathy. Tr. 1384.

23   In May 2014, Dr. Jefferson reported that he "performed an EMG/NCS on 4/24/14, which showed

ORDER REVERSING AND REMANDING FOR FURTHER
ADMINISTRATIVE PROCEEDINGS - 7

1  evidence of a mild axonal polyneuropathy affecting the sensory nerves in a length dependent

2  fashion, as well as evidence of a mild right L5-1 radiculopathy." Tr. 1821. Dr. Jefferson accepted

3  plaintiff's history of diabetes and prior bilateral carpal tunnel release and noted that plaintiff had

4  mild diabetic axonal polyneuropathy affecting the sensory nerves as well as occasional twitches

5  that occur when she is hypoglycemic. Tr. 1824.

6      The ALJ's decision is not supported by substantial evidence because it avoids the

7  Appeals Council's instruction to examine plaintiff's testimony and "evidence pertaining to

8  complaints of myoclonic jerks and diabetic neuropathy affecting the hands." Tr. 300. While Dr.

9  Bergman's medical notes may indicate plaintiff's manipulative limitations ended on September

10  12, 2012, (ALJ's reasons 1 and 2), he did not treat plaintiff after that date and did not address

11  pain or numbness unrelated to the carpal tunnel release surgery. The ALJ was incorrect about

12  plaintiff never returning to a specialist with complaints about her hands (ALJ's reason 3).

13  Plaintiff reported pain and numbness not only to her primary care physician but also to pain

14  specialist Dr. Balkany and neurologists Drs. Samman and Jefferson. Moreover, plaintiff and

15  treating physicians accepted that her lingering hand symptoms were unrelated to carpal tunnel

16  syndrome. That independent L&I examiners in October 2011 rated plaintiff's upper extremities

17  as only 2 percent impaired (ALJ's reason 4) does indeed undermine claimed manipulative hand

18  limitations, particularly given the examiners' determination that although plaintiff "has some

19  numbness in the ulnar distribution . . . there is no decreased sensation to light touch." Tr. 1199.

20  Nonetheless, such a determination cannot have talismanic value when there is significant,

21  possibly contradictory evidence that has not been adequately evaluated. The intermittent nature

22  of plaintiff's hand complaints (ALJ's reason 5) similarly cannot stand on its own, particularly

23  given that plaintiff's testimony about continued hand numbness and pain has been consistent

1   through the years and her treating physicians have accepted diabetic neuropathy of her upper

2   extremities as a chronic condition explored via x-rays, electromyography, and sensory

3   examinations and treated with nerve pain medication. That there were no post-September 2011

4   EMG studies showing abnormal results (ALJ's reason 6) is contradicted by Dr. Jefferson's

5   acknowledgement that he conducted an April 2014 EMG that showed axonal polyneuropathy

6   affecting the sensory nerves.

7          The Court finds that the ALJ's determination that medical improvement of plaintiff's

8   hands allowed her to work after the closed disability period is unsupported by substantial

9   evidence and is the result of harmful legal error. The Court declines, however, to remand for an

10  award of benefits because even if the overlooked medical evidence were credited as true, the

11  ALJ would not be required to find the claimant disabled on remand and further proceedings

12  could help to clarify the severity of plaintiff's manipulative hand limitations. *See Garrison v.*

13  *Colvin*, 759 F.3d 995, 1020 (9th Cir. 2014). On remand, the ALJ will have the opportunity to

14  obtain additional evidence about plaintiff's continued manipulative limitations of the hands,

15  further evaluate plaintiff's subjective complaints, further consider RFC, and, if necessary, obtain

16  evidence from a ME and testimony from a VE.

17          **2.  ADHD**

18          Plaintiff contends that the ALJ harmfully failed to consider ADHD and its effects on her

19  ability to maintain pace and concentration. The Court disagrees.

20          At step two, the ALJ determined that ADHD did not constitute a severe impairment

21  because, though occasionally mentioned, the record did not contain a diagnosis from an

22  acceptable medical source based on appropriate test findings. Tr. 25. Nonetheless, the ALJ found

23  a number of mental impairments to be severe —affective disorders variously diagnosed as

ORDER REVERSING AND REMANDING FOR FURTHER
ADMINISTRATIVE PROCEEDINGS - 9

depression, dysthymia, and bipolar; anxiety disorder; PTSD; intermittent explosive disorder; and personality disorder—and considered all of plaintiff's mental symptoms regardless of diagnoses in assessing RFC and the subsequent steps of the sequential evaluation. Tr. 19, 25. The Court must therefore determine whether any error in the ALJ's omission of ADHD as a severe impairment at step two is harmless. *See Lewis v. Astrue*, 498 F.3d 909, 911 (9th Cir. 2007).

Plaintiff has failed to show that the ALJ's omission of ADHD as a severe impairment was harmful to the evaluation of mental RFC or other aspects of the sequential evaluation. First, plaintiff argues that examining psychologist Ellen Walker Lind, Ph.D.,[1] diagnosed ADHD in 2008. *See* Tr. 819. The key here is, however, that the ALJ referred to an absence of a diagnosis of ADHD by an acceptable medical source "based on appropriate test findings." Tr. 25. The ALJ gave little weight to Dr. Walker's opinion because she did not provide specific mental status findings consistent with her conclusions: she indicated deficits in memory but based those deficits entirely on plaintiff's reports; she indicated concentration deficits due to long-term issues with ADHD but had reviewed no treatment or other records; and there were no records from acceptable medical sources that based the ADHD diagnosis on imaging or other objective findings.[2] Tr. 35.

---

[1] Although the ALJ refers to "Dr. Walker" and plaintiff refers to "Dr. Lind," it appears that the psychologist refers to herself professionally as Dr. Ellen L. Walker. *See* https://www.ellenlwalker.com/ (last accessed July 27, 2020).

[2] In a footnote, plaintiff refers to Dr. Walker's similar diagnoses of ADHD in 2016 and 2017, the second of which was available only to the Appeals Council. Dkt. 14, at 16 n.3 (citing Tr. 108–11, 1802). Those diagnoses suffer from the same maladies as the 2008 diagnosis. In the same footnote, plaintiff also refers to the Commissioner's medical expert Kenneth Asher, Ph.D., at the 2014 hearing stating a belief that plaintiff has ADHD. Dkt. 14, at 16 n.3 (citing Tr. 170, 1292–98). Plaintiff does not, however, challenge the ALJ's lengthy reasons for discounting Dr. Asher's opinion as inconsistent with the longitudinal evidence. Tr. 36–37.

ORDER REVERSING AND REMANDING FOR FURTHER
ADMINISTRATIVE PROCEEDINGS - 10

Second, plaintiff argues that it was harmful error for the ALJ to have given great weight to the non-examining opinions of consulting psychologists Christmas Covell, Ph.D., and Leslie Postovoit, Ph.D., without including within the RFC assessment the conclusions by Drs. Covell and Postovoit that plaintiff would have moderate limitations in the ability to sustain an ordinary routine without special supervision and the ability to complete a normal work day or work week without interruptions from her psychologically based symptoms. *See* Tr. 848–49. Thus, according to plaintiff, the RFC assessment should have included "intermittent difficulty with pace and persistence" and that plaintiff would do better in a low-pressure environment with minimal changes. Tr. 850, 852. Plaintiff's contention is unpersuasive because although Drs. Covell and Postovoit accepted the diagnosis of ADHD alongside diagnoses of dysthymia, bipolar disorder, and anxiety disorder, *see* Tr. 835, 837, 839, they, like the ALJ, did not attribute plaintiff's mental RFC to ADHD alone but to the entirety of all mental limitations, Tr. 850, 852. It is the ALJ's duty to reconcile conflicting medical opinions and the ALJ's decision to give great weight to the opinions of non-examining psychologists Dr. Covell and Postovoit did not mean that any deviation from their opinions constituted harmful error. Tr. 34. The ALJ determined that plaintiff had only a mild limitation with regards to concentrating, persisting, or maintaining pace because treatment notes showed few complaints in this area; she obtained little mental health treatment apart from medication; claimant typically presented in no acute distress and displayed little to no abnormality in affect, speech, memory or concentration; a May 2010 psychiatric evaluation by David Sandvik, M.D., revealed normal function in this area; and later IQ testing showed overall average function. Tr. 20 (citing Tr. 829–32, 875, 881–90, 891–901, 1104–1190, 1292–98), Tr. 32–33. It is clear that the ALJ accepted the opinions of Drs. Covell and Postovoit to the extent they were consistent with Dr. Sandvik's examining opinion; Dr.

Sandvik opined that plaintiff's mental status testing was "quite good," there was no apparent impairment in the capacity to reason, understand, or remember, and at the interview plaintiff was able to sustain concentration and keep pace. *See* Tr. 34 ("The opinions [of Drs. Covell and Postovoit] are also consistent with the objective mental status findings from Dr. Sandvik's thorough psychiatric evaluation."); Tr. 831 (Dr. Sandvik's opinion). Moreover, the ALJ gave ample, unchallenged reasons for concluding that the record did not suggest more mental limitations than those accommodated in the RFC, such as that plaintiff had worked for years with her assessed mental limitations and only stopped working due to physical, not mental, limitations. Tr. 32.

The Court finds that the ALJ did not commit harmful legal error by determining at step two that ADHD was not a severe impairment or by failing to adequately consider ADHD in assessing RFC or conducting the sequential evaluation.

## CONCLUSION

For the foregoing reasons, the Commissioner's decision is **REVERSED** and this case is **REMANDED** for further administrative proceedings under sentence four of 42 U.S.C. § 405(g).

On remand, the ALJ should address the evidence of manipulative restrictions of the hands related to diabetic neuropathy, myoclonic jerks, and de Quervain's tenosynovitis. The ALJ may obtain additional evidence concerning plaintiff's physical impairments; should further evaluate plaintiff's subjective complaints; should further consider plaintiff's RFC; may obtain evidence from a ME; and may obtain testimony from a VE.

DATED this 28th day of July, 2020.

BRIAN A. TSUCHIDA
Chief United States Magistrate Judge

ORDER REVERSING AND REMANDING FOR FURTHER
ADMINISTRATIVE PROCEEDINGS - 12